Whitaker, Judge,
concurring in the result:
The majority opinion restricts plaintiff’s patent to such an extent that there is practically nothing of it left. As so restricted, it says defendant has not infringed it. If it is to be so restricted, I agree defendant has not infringed it. But I do not think the claims were intended to be so restricted. Ascribing to them an intention to claim that which the words seem to me to import, I agree that they are anticipated by the prior art. I would hold the patent invalid and, hence, would not reach the question of infringement.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Donald E. Lane, and the briefs and argument of counsel, makes findings of fact as follow:
1. Plaintiff petitions under Title 28 U.S.C. Section 1498, for reasonable and entire compensation for unlicensed use of inventions described in and covered by United States Letters Patent 2,330,142 and 2,330,143, hereinafter referred to as the ’142 and ’143 patents. Plaintiff charges infringement of the ’142 and ’143 patents by the production of magnesium metal for defendant in plants owned by the defendant at Canaan, Connecticut; Wingdale, New York; and Manteca, California, within the period from January 20, 1949, to the filing of the plaintiff’s original petition on December 14,1953.
2. As originally filed, plaintiff’s petition alleged infringement of ten patents. In an amended petition, filed October 11, 1955, another patent was added to those charged as being infringed. As a result of discovery proceedings, in- *254 eluding disclosures as to the details of the accused manufacturing plants and also defenses available to defendant, plaintiff’s charges of infringement were withdrawn as to seven of the 11 patents, and agreement was reached on the specific operations and structures of the three accused magnesium plants. Subsequent to the close of plaintiff’s prima facie case, the charge of infringement of another patent was withdrawn, and at the outset of plaintiff’s rebuttal case plaintiff withdrew its charge of infringement of still another patent. Plaintiff then continued the trial with its charge of liability directed to 20 selected claims in the ’142 and ’143 patents. In its proposed findings of fact, plaintiff withdrew four additional patent claims and in its reply brief withdrew another four patent claims, thereby leaving only 12 claims for consideration. In its brief to the court after submission of the trial commissioner’s findings, plaintiff declared that, while it did not agree with his findings of non-infringement as to eight of the 12 remaining claims, it would “forego analysis thereof and rely solely upon the remaining claims, to reduce the issues bef ore this court.” In this manner, only four claims contained in the ’142 and ’143 patents remain for consideration by the court.
3. At pretrial, the parties agreed that upon its being established in the record by proof, including matters stipulated between the parties and approved by the Commissioner, of the manufacture by or for, or the use by or for, the United States of one or more apparatus or methods alleged in the petitions to infringe the patents in suit, the issues of validity and infringement of the patents by the United States would be first determined upon full proofs, findings of fact, and argument of counsel, and the parties further agreed that the accounting issue, including evidence as to the extent of liability, if any, of the United States and the amount of reasonable and entire compensation, if any, due to the plaintiff on account thereof would be deferred until after the entry of the order of the court on the issue of liability. At pretrial the parties also agreed that the trial of the liability issue should be held in two stages, the first to include plaintiff’s prima facie case, and the second stage to commence on a date 30 days subsequent to defendant’s *255 statutory notice of defenses and to include defendant’s presentation of its proofs.
4. Plaintiff is a corporation organized and existing under tbe laws of the Province of Ontario, Canada. The ’142 and ’148 patents were granted to plaintiff on September 21,1943. The application which became patent ’142 was filed in the Patent Office on November 3, 1941, was assigned by the applicant on November 13, 1941, to the Honorary Advisory Council for Scientific and Industrial Eesearch (hereinafter called CSIE) and was assigned on April 27,1943, by CSIE to the plaintiff. The application which became patent ’143 was filed on February 11,1942, was assigned on February 16, 1942, by the applicant to CSIE, and was assigned on April 27, 1943, by CSIE to plaintiff. Plaintiff has never transferred any interest of any kind in patents ’142 and ’143 to any other party.
5. The Government of Canada accords to citizens of the United States the right to prosecute claims against the Canadian Government in Canadian courts.
6. Plaintiff has never been in the employment or service of the United States since the filing of the original petition in this case, and there has been no other action on the present claim.
7. The general subject matter of this litigation is the production of magnesium metal by direct thermal reduction of magnesium containing material. The mineral dolomite, a calcined magnesium carbonate which occurs extensively in nature, is such a material and it is calcined by heat for use in the reduction process. Silicon in the form of ferro-silicon is employed as a reducing agent. Furnaces having a number of horizontally disposed elongated hollow retorts are employed. Batches of the reaction material are charged into the retorts, and crowns or condensates of magnesium metal are withdrawn from the retorts at the end of the reduction process. Vacuum pumps exhaust the retorts to very low pressures during the reduction runs. Under these conditions the silicon takes oxygen from the calcined dolomite, and the magnesium metal is liberated as a vapor. The vapors are then condensed to form solid crowns of magnesium metal. Dolomite as quarried is normally accompanied *256 by metals containing small amounts of alkali metals, chiefly sodium. These metals are also liberated as vapors during the reduction reaction, and are also condensed.
8. The two patents remaining in suit are related, in that ’143 is a continuation-in-part of ’142, and the applications were co-pending in the United States Patent Office. On October 21, 1941, L. M. Pidgeon filed a patent application in Canada corresponding to the application in the United States upon which the ’142 patent was granted. On February 5, 1942, Pidgeon filed another patent application in Canada corresponding to the application in the United States upon which the ’143 patent was granted. The United States patent applications for ’142 and ’143 were filed on November 3, 1941, and February 11, 1942, respectively.
9. A basic understanding of the ’142 and ’143 patents may be gained by reference to portions of the patent drawings reproduced below. The ’142 and ’143 patents describe and illustrate similar equipment which includes a furnace designated 2 in ’142, and 1 in ’143, in which at least one elongated hollow retort, 1 in ’142, 2 in ’143, is positioned. Each retort has a reduction zone or portion 3 within the furnace, and a condensing zone or portion 4 projecting outside of the furnace. Between these portions and substantially at the furnace wall there is a baffle or thermal radiation shield structure having passages therethrough. This shield includes the elements 24, 24', and 24' in ’142, and a single apertured plate at the furnace wall in Fig. 2 of ’143. A ’142 figure shows passages 26 through the plate 242. Similar openings are provided in the companion plates 24 and 24'. The end of the retort within the furnace is permanently closed.
10. The retort condensing portion or zone projecting outside of the furnace wall is provided with a removable cover, 16 in ’142, 9 in ’143, and is provided with a gasket, 20 in ’142, which seals the retort in use. Inside the condensing zone there is a condensing sleeve, 5 in both patents, the sleeve being of lesser outside diameter than the inside diameter of the retort, and being removable from the retort when the cover is off.

*257

11. The condensing sleeve 5 is provided in its onter portion with a transversely positioned circular baffle plate, 21 in ’142, 19 in ’143. This plate is of a diameter less than the inside diameter of the sleeve 5 to provide a passage around the periphery of the baffle. This baffle plate is supported by pins, 22 in ’142, 24 in ’143, which extend to and are secured in a plate, 14 in ’142, 11 in ’143, which engages the end of the condensing sleeve 5. Additional plates, upper *258 21 and 21' in ’142, 17 and 18 in ’143, are provided between the baffle plate and the outer end of the retort. These series of plates serve the same purpose in the constructions illustrated in the ’142 and ’143 patents.
12. Leading out of the assembled retort and at or near the outer cover is a pipe, 13 in ’142,15 in ’143, through which the atmosphere within the retort may be evacuated. The condensing section 4 of the retort outside of the furnace 1 is provided with an encircling water jacket arrangement 92, 93, and 94 in ’142, 16 in ’143, through which water may be circulated to absorb and carry off heat liberated within the condensing section of the retort. Operation of the equipment involves successive cycles or runs providing for “batch” operation. The furnace is continuously fired to heat the retort above 1100° C. with no change in firing between the runs or batches.
13. The specification of the ’142 patent in suit states that the object of the invention is to provide an improved and conveniently operated method and apparatus for reducing magnesia containing material or for treating magnesium to form magnesium vapor and for condensing the vapor to form the metal in crystalline form. The specification of the ’143 patent in suit states that it is a continuation-in-part of the ’142 patent application and is directed to the direct thermal reduction of calcined magnesium containing materials by ferrosilicon. The specifications indicate that the condensed magnesium metal may be removed from the retorts while the retorts remain in the furnace at a substantially constant temperature to avoid deterioration of the retorts and to avoid heat losses.
14. The specification of the ’142 patent describes the operation of the apparatus illustrated by stating that a charge of magnesia containing material and reducing agent, or other desired charge, is placed in the reducing or heating zone of the retort, the retort and condenser closed, and the retort heated to volatilize the charge at a temperature of about 1100° to 1400° C. while maintaining a vacuum in the retort in the neighborhood of 0.1 millimeter or less of mercury. The ’142 specification states that the inner end of the condenser 5 is tapered as at 6 to seat snugly against the complementary *259 bevel 7 of the retort wall to prevent escape of vapors between the condenser and the retort wall. The ’143 specification likewise states that the inner end of the condenser 5 is seated in pressure contact 'with the wall of the retort. The ’143 specification describes the operation of the apparatus illustrated by stating that a charge of briquetted magnesium containing material and ferrosilicon is successively charged into the retorts, that the removable condenser and the fractionating condenser are put in place, and that the retorts are evacuated and heated. The ’143 specification states that the metal vapors impinging on the disc 19 are deflected to the wall of the condenser 5 where the magnesium condenses in a unitary structure 22 substantially as shown. It further states that the disc 19 is “out of thermal contact with the condenser wall and remains at a higher temperature than the other disks.” “[B]eing out of thermal contact with the condenser wall and remaining hot, insures deposition of the magnesium only on the wall of the removable condenser, where it builds up into a unitary structure with an inwardly projecting ledge [23].” The ’142 specification in describing the series of spaced plates 21 and 21' states that the plates 21 are of lesser diameter than the retort, and that the innermost of the plates “is substantially independent of the cooler and in operation does not accumulate condensate.”
15. The innermost plate in each patent drawing, lower plate 21 in Fig. 3 of ’142, and plate 19 in Fig. 2 of ’143, have been termed “vital plate” by counsel. In the normal operation of the apparatus illustrated in the ’142 and ’143 patents, metal magnesium does not condense on said vital plate. While magnesium condenses on the condenser sleeve between the vital plate and the furnace end of the sleeve, sodium vapor, which has a higher vapor pressure than magnesium and requires a colder surface for condensing, passes around the edge of the vital plate and condenses beyond the magnesium condensing zone. A typical cross-section of magnesium condensate is designated 22 in Fig. 2 of the ’143 patent drawings and has an inwardly projecting ledge 23 adjacent to and spaced from the periphery of the vital plate 19. When the evolution of vapors from the charge is completed and the vapors have been condensed, the closure device *260 of tbe ’142 apparatus is removed and the condenser is withdrawn for the removal of metal magnesium therefrom. The ’143 specification likewise teaches that when the heating cycle of the initially charged retort is complete, the vacuum is broken and the retort is discharged in air. The ’143 specification states that the fractionating condenser is first removed, carrying with it any pyrophoric metal fraction which most readily ignites when hot upon exposure to air, and which if not so removed is likely to ignite the hot magnesium in the retort. The ’143 specification continues by stating that the removable condenser with the pure magnesium fraction is then removed without the necessity of further cooling to avoid ignition. After removing the residue of the charge from the retort, the retort is ready for a new charge, a new condenser sleeve 5, and replacement of the fractionating condenser and retort closure members.
16. Plaintiff now relies on claim 27 of the ’142 patent and on claims 18,19, and 20 of the ’143 patent. Claim 20 of ’143 is an apparatus claim, and the other claims still in suit are method, claims.[13]
17. Considering first the apparatus claim, claim 20 of ’143 reads as follows:
Patent Claim HO of ’7A?
Apparatus for producing coherent masses of magnesium from magnesium containing rock by thermal reduction under reduced pressure with ferrosilicon, comprising
a furnace,
a plurality of metal retorts having a reducing and volatilizing portion within the furnace and at least one end portion without the furnace constituting a condenser for metal vapours,
means for producing reduced pressure within the retorts,
each condenser having in operation a relatively warm zone and a cooler zone,
said zones being separated by a vapour 'deflecting and retarding partition having a vapour passage there-through,
and a removable closure for each condenser,
said cooler zone being adjacent said closure.
*261 Tlie apparatus illustrated in Fig. 2 of ’143 is for producing coherent masses of magnesium and includes a furnace 1, retorts 4 having a reducing and volatilizing portion within the furnace 1 and a condensing portion 5 without the furnace 1, a connection 15 for pressure reduction, warm and cool zones within the condenser 5 separated by the intermediate plates 18 and 19 which have a vapor passage there-through, and has a removable closure 11 adjacent the cooler zone of the condenser.
18. Considering next the method claims, claim 21 of ’142 reads as follows:

Patent Olaim 27 of 'llfi

In the production of metallic magnesium by direct thermal reduction under reduced pressure of magnesia containing material, the method which comprises
heating the material to form metal vapours in a metal retort disposed within a furnace under normal pressure and with the inside of the retort under subatmospheric pressure with an end portion without the furnace to receive and condense said vapours,
cooling said end portion,
retarding the flow of said vapours at a point within the condenser adjacent to but removed from the outer end of the condenser portion of the retort to condense therein magnesium vapour to solid form in one zone,
further cooling the remaining vapours adjacent the outer end of the retort,
discharging the retort while hot in air and recharging the hot retort.
The specification of the ’142 patent discloses such a method wherein magnesium is produced by direct thermal reduction, under reduced pressure, of magnesia containing material including the steps of heating the material in a retort 8 disposed in furnace 2 under normal pressure and having a projecting end portion 4 without the furnace 2, which end portion is cooled by a water jacket 94, the flow of vapors being retarded by the plate 21 located at a point within the condenser 5 adjacent to but removed from the outer end 14 of the condenser 5 to condense magnesium in the solid form. The vapors which pass beyond the plate 21 are further cooled by the coolmg jacket 92 adjacent the outer end 14 of *262 the retort, and the ’142 specification states that the retort may be discharged by withdrawal of the condenser, and that after the residue of the charge is removed from the retort the operating cycle may be repeated.
19. Method claim 18 of ’143 reads as follows:

Patent Claim 18 of ’’l43

A method of producing metallic magnesium by direct thermal reduction which comprises
heating, to vapours, ing material and ferrosilicon under reduced pressure in the reducing portion of a metal retort stationarily located in a furnace with an end of the retort without the furnace and constituting a condenser portion to receive said vapours,
vapours tion at a point spaced from its outer end to cause the magnesium vapors [sic] to condense into a coherent structural form and build up at said point spaced from the outer end of the condenser,
removing the without ignition,
withdrawing the hot
recharging retort
The specification of the ’143 patent discloses such a method wherein metallic magnesium is produced by diréct thermal reduction of magnesium containing material and ferrosilicon by heating, retarding vapor flow, removing hot magnesium, withdrawing the residue, and recharging the retort while hot.
20. Method claim 19 of ’143 reads as follows:

Patent Claim 19 of '143

A method of producing metallic magnesium by direct thermal reduction which comprises
heating to form metal vapours magnesium containing material and ferrosilicon under reduced pressure in a metal retort disposed within a furnace with an end portion without the furnace for condensing said vapours,
condensing the vapours within the condenser portion of the retort,
retarding and deflecting vapours a point spaced from the outer end of the retort to cause *263 magnesium vapour to condenser [sic] before passing said point,
further cooling uncondensed vapours in a zone adjacent the outer end of the retort,
removing the magnesium without ignition at atmospheric pressure,
withdrawing the hot residue and
recharging the retort while hot.
Method claim 19 of ’143 is generally similar to claim 18, but claim 19 specifically recites the step of retarding and deflecting the flow of vapors at a point to cause the magnesium vapors to condense before -passing the point, and recites the step of further cooling uncondensed vapors in a zone adjacent the outer end of the retort. The specification of the ’143 patent teaches such a method.
21. The patentee named on the ’142 and ’143 patents in suit, Lloyd M. Pidgeon, graduated from the University of Manitoba in 1925 with a B.A. degree in physics and chemistry, and received a Ph. D. degree in physical chemistry in 1929 from McGill University. After receiving a further degree at Oxford University, Dr. Pidgeon was employed as a research chemist by the National Eesearch Council in Ottawa in 1932. About 1937, Dr. Pidgeon became a member of a Canadian research group working to develop a process for obtaining metallic magnesium. Dr. Pidgeon investigated scientific literature including prior patents, and experimented with various processes. Dr. Pidgeon testified that he concluded that the most effective process was the reaction between silicon and dolomite. He testified that in his experiments with the reaction between dolomite and ferrosilicon he successfully operated a 4-inch diameter retort at Ottawa in the autumn of 1940. The ’143 specification discloses the direct thermal reduction of magnesium containing materials by ferrosilicon. Plaintiff began financing magnesium research work for the Canadian National Eesearch Council in January 1941. Dr. Pidgeon was employed by plaintiff from November 1941 to October 1943 for research work, and thereafter became a consultant to plaintiff on annual salary. More recently, Dr. Pidgeon became a member of the board of directors of plaintiff. Dr. Pidgeon is named as inventor on several United States letters patent *264 other than ’142 and ’143, and also relating to the recovery of volatilizable metals.
22. The outcome of Dr. Pidgeon’s research in 1941 was the provision, in the retort condensing portion outside the furnace, of structure presenting a transverse baffle or partition across the condenser, the partition providing an opening through it adjacent the condensing sleeve so that, in the course of condensation, magnesium vapor would be deflected by the partition to the relatively cool condenser wall and form a solid condensate thereon. This form of condensate, massive throughout and having a maximum thickness at its cold end, rendered the magnesium condensate invulnerable to fires. The partition allowed sodium metal, easily flammable when the retort is opened to air during discharge, to condense beyond the baffle or partition and independent of the magnesium condensate. By the use of this condenser baffle idea, Dr. Pidgeon achieved desirable massive deposits. The partition baffle achieved the separation of sodium from magnesium and obtained condensation permitting opening of the retort in air and avoiding metal of poor quality.
23. In November of 1941, plaintiff retained the consulting engineering firm of Singmaster and Breyer, New York City, to evaluate the “Pidgeon Process,” and to guide the building of a production plant in Canada. The consulting engineers inspected the Ottawa pilot plant operation in detail and went ahead with plans for the erection of a complete plant at Haley, Ontario, which plant was in operation in the early fall of 1942.
24. By November 7, 1941, the director of the United States Bureau of Mines had heard of Dr. Pidgeon’s research and received permission to send a representative to Canada. His representative, P. M. Ambrose, accompanied by a representative of the United States Office of Production Management, visited Dr. Pidgeon in Ottawa November 13 and 14, 1941. In the fall of 1941 there was organized as part of the United States National Academy of Sciences a subcommittee on magnesium, formed of metallurgical experts including P. M. Ambrose, mentioned above, H. E. Bakken, and others. On January 9, 1942, members of the subcommittee visited Dr. Pidgeon at his pilot plant operation, Ottawa. On Janu *265 ary 13, 1942, the chairman of the group of subcommittee members submitted a report concerning the condenser used in the Pidgeon process. The committee report stated—
The Committee believes that Dr. Pidgeon and his associates have done a clever job in preferentially condensing the sodium from the magnesium thus permitting discharging of the condenser at a higher temperature than if the sodium and magnesium were co-deposited.
25. Various representatives of American plants visited Dr. Pidgeon’s pilot plant in late January 1942. These visitors included representatives of the Permanente Metals Corporation of San Jose, California, part of the Kaiser group who subsequently built a ferrosilicon plant at Manteca, California. Eepresentatives of the New England Lime Company visited Dr. Pidgeon and later built a plant at Canaan, Connecticut. Eepresentatives of the National Lead Company visited Dr. Pidgeon and later built a plant at Luckey, Ohio.
26. At defendant’s request, plaintiff released Singmaster and Breyer, consulting engineers, and defendant then contracted with that firm to be the architect-engineers on the plants erected at Canaan, Connecticut, Wingdale, New York, and Luckey, Ohio. Said engineers also had a consulting contract on the Kaiser plant built at Manteca, California. During the summer of 1942, the United States National Academy of Sciences requested that Dr. Pidgeon serve it so as to advise upon the adoption of the ferrosilicon process in the United States.
27. Upon the grant of patents ’142 and ’143 in 1943, plaintiff asserted a claim for infringement thereof by operation for defendant of its dolomite-ferrosilicon plants in the United States including those at Canaan, Connecticut, Wingdale, New York, and Manteca, California, the operations now accused in the present litigation. A settlement of the 1943 claim with respect to patent infringement and other matters was reached on January 19, 1949. This settlement agreement (plaintiff’s exhibit 2) between defendant’s Eeconstruction Finance Corporation and the plaintiff provided for the payment of $125,000 by EFC to plaintiff for any and all claims of plaintiff against the United States, EFC, and *266 each and every operator, and “for any and all designs, plans, drawings, construction, operating and maintenance instruction, engineering data and plant details, materials, services, or facilities furnished by Dominion to the United States, RFC, DPC and any Operator, and for any use or alleged use by any or all of them of any of Dominion’s trade secrets, inventions or technical information relating to the production of magnesium and other metals or materials by the retort process, sometimes called the ferrosilicon process.”
28. The settlement agreement also provides as follows:
ARTICLE v
Notwithstanding anything herein contained, this agreement shall not be construed as a license for continuing operation under any Letters Patent covering inventions now or hereafter owned by Dominion, nor as a recognition by the United States, RFC, or any of the various Operators of the validity or infringement of any such Letters Patent, and the said payment is made and accepted without prejudice to the rights of Dominion to assert any such Letters Patent against the future use of the inventions, named therein, as fully as if this agreement had never been made, and without prejudice to the rights of the United States, any of its agencies, RFC or the various Operators, purchasers, lessees or transferees of said plants, or any of them, their successors or assigns, to use and assert any defense against, and contest the validity or future claims of infringement of any such Letters Patent which might be available to them had this agreement never been made.
29. The accused plants and methods of operation at Canaan, Connecticut, and Wingdale, New York, have been stipulated to be identical. This equipment and methods are described in the Canaan brochure, Commissioner’s exhibit 1, which is incorporated herein by reference. The accompanying diagrammatic sketch, marked Canaan-Wingdale, illustrates, in section, one of the plurality of retorts used in each furnace at each plant. The tubular retort comprises a hot end portion projecting through a brick wall into a furnace heated by oil-fired burners. The hot end 30 of each retort within the furnace is closed by a cap 31. The opposite, or cool end, portion of each retort projects outside of the fur *267 nace wall and includes a tubular section 32 joining the inner hot section 30 to the outer cool section 34, the latter being provided with a water jacket 36 connected to a water cooling system. The cooled section 34 is closed at its outer end by a removable cover 40 engaging a gasket 44 against the flanged member 37, welded to section 34. The retort is connected to a vacuum system by the connection 35. A removable tubular condenser sleeve 50 is loosely positioned in the cooled portion 34 of the retort and is provided with apertures 51 into which pins may be inserted for pulling the sleeve 50 out of the retort. The left end of the sleeve 50 does not seat against the retort wall. Within the outer portion of the condenser sleeve 50 is a block or plate 60 having an outwardly extending tubular flange or rim 61 to hold the block upright. A typical block 60 is about 914" outside diameter loosely inserted in a condenser sleeve 50 having an inside diameter of about 10". A baffle plate 65 having a central aperture 66 is loosely positioned inside the retort between the hot section and the cooled section.
30. During operation of the Canaan-Wingdale type plants, each retort B is charged with briquettes containing ferro-silicon, calcined dolomite and fluorspar formed in a briquet-ting press. The briquettes are bagged in paper containers and pushed into the hot end of the retort, and the furnace is continually fired to about 2150° F. [1176° C.]. After the retort is charged with bagged briquettes, the radiation baffle plate 65 is inserted, the condenser sleeve 50 is inserted in the cool portion of the retort together with the block 60, the retort cover 40 is secured in position, and a conduit 35 is then connected to the vacuum system. Pressure inside the retort is reduced to 100-200 microns [.1-.2 millimeters of mercuryj. After about 11 hours under vacuum, a block or crown 111 of magnesium is fully formed in the condenser sleeve 50, and the retort is ready for unloading. The vacuum system is then closed and the retort cover 40 is removed. Any powdery sodium or magnesium in the space between the block 60 and the cover 40 either bums or is scraped out of the outer end of the retort. The sleeve 50 containing the magnesium crown is then withdrawn from the retort and placed in a press for mechanically forcing the magnesium crown out of the sleeve

*268

*269 50. The retort may be immediately recharged with bagged briquettes, baffle plate, condenser sleeve, and block, and the condensing cycle repeated.
31. The resultant magnesium crown or condensate is a unitary mass of dense, coherent, macrocrystalline [relatively large crystals] metal, devoid of any significant amount of impurities or pyrophoric magnesium. It is in such form that it may be readily recovered as a single compact piece of metal simply by pushing it out of the sleeve 50. Such a magnesium crown produced at defendant’s Canaan plant is defendant’s exhibit 22 herein. Being substantially a cylinder, with one end and the cylindrical wall smooth, it offers minimum surface area per unit mass. Accordingly, there is minimum loss due to surface oxidation and nitriding by oxygen and nitrogen in the air, and loss in subsequent meltdown of the crowns into ingot form is minimized. During the course of a run, the metal vapors evolved from the charge pass through the aperture 66 in the radiation shield 65. The block 60 retards and deflects the metal vapors which reach it. The block 60 runs at a temperature higher than the temperature of the cooled sleeve 50 where the latter surrounds the block. The block 60 has direct thermal contact with the sleeve 50. Block 60 with its rim 61 is more massive than the comparable baffle plate of the patents (lowermost 21 in ’142; 19 in ’143), and is not backed up by additional plates intervening between block 60 and the removable cover 40.
32. Plaintiff made a large number of test runs of various equipment in Canada in preparing its rebuttal case. These tests include the operation of retorts similar to the Canaan-Wingdale retorts, and retorts without the Canaan-Wing-dale block 60, for various intervals of time to show the deflecting and retarding action of the Canaan-Wingdale block 60. Even without these test results, the evidence clearly warrants a finding that during normal operation of the Canaan-Wingdale equipment, the forward motion of magnesium vapors is stopped completely when the magnesium vapors reach the block 60 or any condensate thereon. The movement of magnesium vapors not condensed on the block 60 is retarded by the block 60 and such vapors move toward the surrounding condenser sleeve 50. The test program car *270 ried out by plaintiff at dence attempted to reproduce and test apparatus like the accused Canaan-Wingdale and Manteca plants, and also attempted to reproduce and discredit apparatus disclosed in certain prior art items.
33. The accused plant and methods of operation at Man-teca, California, are described in the Manteca brochure, Commissioner’s exhibit 2, which is incorporated herein by reference. The accompanying diagrammatic sketch, marked Manteca, illustrates, in section, one of the plurality of retorts used in each furnace at the Manteca plant. Keferring to the Manteca sketch, the furnace wall appears in the center and bears the legend “fire brick.” To the left of the furnace wall is the reducing or hot end portion of the retort, and to the right of the furnace wall is the condenser portion of the retort. The reducing portion is of stainless steel and the condenser portion of mild steel. The hot end of the retort inside the furnace is formed as a hemispherical cap and is permanently closed. The opposite end of the retort is provided with a removable cover fitted by a gasket to a flange on the end of the retort. A radiation shield is provided between the two portions of the retort adjacent the furnace wall and is made up of two substantially parallel hexagonal plates separated 'by spacers, the plate on the condenser side having a central aperture. Due to the hexagonal shape of the radiation shield plates and the aperture in one of the plates, space exists for the passage of metal vapors from the reduction zone to the condensing zone. A removable condenser sleeve is provided in the condensing portion of the retort, and the outside diameter of the sleeve is less than the inside diameter of the surrounding retort. The condenser sleeve is positioned in the retort with contact only along the bottom of the retort. The left end of the Man-teca sleeve does not seat against the retort wall. The Man-teca condenser sleeve is provided near its cold outer end with a backplate structure. Three types of backplate structure were used at Manteca, two generally comprising a first circular plate and a second circular plate separated by spacer members. In one form the two plates may be separated, and in another form the spacers are welded to both plates. In these structures the diameter of the plates is less than

*271

*272 the internal diameter of tbe condenser sleeve and therefore the plates present a crescent-shaped opening between the periphery of the plates and the surrounding sleeve. Additional openings are provided through the plates by a series of apertures distributed adjacent the periphery of one of the plates and located centrally in the second plate. The third type of backplate structure included a single imper-forate circular plate of lesser diameter than the condenser sleeve, and having an outwardly extending peripheral rim, and provides a crescent-shaped opening. The various Man-teca backplate structures are provided with an eye to receive a hook for withdrawing the backplate and the condenser sleeve from the retort together. An inwardly extending rim on the outer end of the condenser sleeve assures that the sleeve will be pulled when the backplate is removed from the retort. The condenser portion of the Manteca retort is provided with an encircling water jacket. Evacuation of the retort is accomplished through a conduit which enters the retort near the removable cover plate.
34. Operation of the Manteca plant is generally similar to that of the Canaan-Wingdale plants, stated above. At the Manteca plant the retorts were charged with briquettes formed of calcined dolomite, ferrosilicon, and ground fluor-spar. The furnace was heated by natural gas burners to a temperature of about 1176° C., and the retorts were evacuated to about 100 microns. After a heating and vacuum cycle lasting about 9 hours, the vacuum valves were closed, the retort cover removed, and the sleeve with the backplate and condensed magnesium withdrawn for mechanically pressing the crown from the sleeve. After removal of the radiation shield and the residue of spent briquettes, the Manteca retort was recharged with bagged briquettes, radiation shield, and condenser sleeve including backplate device, and the condensing cycle was then repeated. The magnesium crowns produced were subsequently melted with flux, and the magnesium metal cast in ingot form. The Manteca backplate structures functioned similarly to the condenser block 60 of the Canaan-Wingdale type of plant. In the accused apparatus, any magnesium and sodium which condensed in the space between the block or backplate and the retort cover, or *273 on the retort cover, was insignificant in amount and presented no problem.
35. Plaintiff also made, for rebuttal, test runs of equipment utilizing backplates such, as used at Manteca. Aside from the results of these tests, the evidence warrants a finding that during normal operation of the Manteca plant, the forward motion of magnesium vapors was stopped when the vapors reached the backplate structure or any condensate thereon. Defendant’s expert testified that the mechanism of condensate buildup would be substantially the same in the Manteca operation as in the Canaan operation, and that the function of the backplate assembly of the Manteca operation is identical with that of the block 60 of the Canaan type operation. In both operations, any vapors of a higher vapor pressure than magnesium, such as sodium, will, if present, pass through the opening at the block or backplate and wind up in the space between this partition and the retort cover.
36. It is apparent that several features exist in common in the various forms of the accused Canaan, Wingdale, and Manteca operations on the one hand, and in the equipment disclosed in the two patents in suit on the other hand. Magnesium metal is produced by direct thermal reduction of magnesium containing material, the retorts have a reducing and volatilizing zone within a furnace and a condensing portion outside the furnace, the furnace firing is continuous, and there is no significant reduction of retort temperature below the reduction temperature between runs. Euns are terminated by opening the retort and permitting outside air to enter. There is no pressurization or evacuation outside of the retorts. The magnesium metal vapors are condensed in a removable condenser sleeve positioned in a water-cooled portion of the retort outside the furnace. There is a partition in the condenser sleeve near the outer or cold end thereof, and there is a vapor passage through or around the partition. The majority of the metal vapors are retarded in their forward motion in the condensing zone by the influence of the partition in the condenser sleeve, and condensed upon the foremost surface of the partition, or upon the sleeve, or upon the magnesium condensate already formed thereon. The magnesium metal, condensed to a solid form, has a dense *274 unitary coherent mass to the hot side of the condenser partition. Most of the above listed common features were generally known in the art prior to the filing of the patents here in suit, as will be pointed out in detail in subsequent findings. Differences between the apparatus disclosed by the ’142 and ’148 patents in suit and the accused apparatus used by defendant include the fact that in the accused plants the hot end of the condenser sleeve did not abut or seat against the retort wall, the fact that the accused plants did not utilize a suspended multiple plate fractionating condenser out of direct thermal contact with the condenser sleeve, and the fact that in the operation of the accused plants, magnesium condensed on the backplate structures as well as on the condenser sleeve forming a solid magnesium crown.
37. Bakken patent 1,594,348 (defendant’s exhibit 26G) issued to American Magnesium Corporation on August 3,1926, and relates to apparatus for the production of pure magnesium by condensing it directly to the solid state. Figure 1 of the Bakken patent drawings is reproduced here to simplify description of the Bakken disclosure. Bakken teaches that crude alloyed, or impure, magnesium may be purified by heating and condensing under reduced pressure. The Bakken apparatus provides a metal retort 2 comprising a steel boot 3 within a heating chamber 9 and welded to an iron condenser 4 projecting outside the furnace. The condenser 4 is provided with a cooling jacket 28 and with a condenser sleeve 31 on which the crystals of magnesium condense and adhere. The apparatus includes a baffle 38 between the hot portion 3 and the cool portion 4 of the retort. The outer end of the cool portion 4 is closed by a removable cover plate 10. The outer end of the condenser sleeve 31 is provided with a removable cover 31'. Depending from and secured to the cover 10 is a well 33 to receive a temperature-measuring device 34. The Bakken apparatus is operated to produce a temperature of about 600° C., in the hot portion 3 of the retort with the pressure reduced to about 200 microns.

*275

38. Bakken 1,594,348 was available to the Patent Office examiner in that it was cited against a claim in the ’143 application on December 1,1942, and the same examiner also acted upon the ’142 application on the same date. In response to the citation of this Bakken patent, in the prosecution of the ’143 application, patent counsel said:
In the Bakken patent the use of a baffle to prevent solid particles being carried from the volatilizing end of *276 the retort to tbe condenser end is illustrated., but Bakken does not disclose a process suck as defined in the claims under discussion, as Bakken’s process is devoted to the purification of impure magnesium rather than the production of pure metal in one operation from magnesium-bearing ores.
The ’142 patent specification states that its object is to provide an improved and conveniently operated method and apparatus for reducing magnesium containing metal or for treating magnesium to form magnesium vapor and for condensing the vapor to form metal in macrocrystalline form. The ’143 patent specification states that it relates to the direct thermal reduction by ferrosilicon of calcined, and preferably crystalline, magnesium containing materials. The patentee named in the ’142 and ’143 patents in suit testified during the trial that the apparatus disclosed in ’142 could be used to volatilize and condense magnesium from magnesium ingots of commercial grade.
39. The major differences between the accused equipment and the Bakken patent apparatus are that the accused plants reduce magnesium containing materials with ferrosilicon at 1176° C., whereas Bakken purifies impure magnesium at 600° C., and that the accused plants provide a partition block fitting loosely within the condenser sleeve, whereas Bakken provides the sleeve 31 with a removable cover 31' at the end of the sleeve. The evidence does not indicate that this cover and removable sleeve act to achieve separate condensation of magnesium vapors from the vapors of other metals, as does the partition block or backplate in the accused apparatus.
40. British patent 270,060 (defendant’s exhibit 26D), also issued to American Magnesium Corporation, was accepted May 5, 1927, and relates to the art of refining calcium and magnesium and their alloys. The apparatus illustrated in British ’060 is generally similar to that shown in Bakken ’348. It includes a steel retort having a hot portion within a furnace and having a condenser shell outside of the furnace. The condenser shell is closed with a removable cover. A condenser liner is positioned in the condenser shell to receive the condensed material. A loosely fitting plate forms a partial closure at the outer end of the condenser liner. The British ’060 patent teaches that magnesium, which may con *277 tain varying amounts of iron, silicon, sodium, oxide, nitrides, chlorides, etc., as impurities, may be purified by heating to about 600° C., under an absolute pressure of 200-500 microns. Magnesium condenses in coherent aggregates of crystallized metal on the condenser liner. By maintaining a constant temperature gradient in the condenser, the more volatile metals such as sodium are said to condense to a point beyond where the magnesium condenses and primarily at the extreme end of the condenser liner.
41. British ’060 was cited by the Patent Office examiner against a claim in the ’143 application at the same time he cited Bakken ’348 and acted upon the ’142 application. The rejected claim was amended to recite retarding and deflecting the flow of vapors at a point spaced from the outer end of the retort, and counsel argued that British ’060 relates to the purification of metal alloys or scrap as distinguished from reduction. British ’060 discloses apparatus intended to be operated at 600° C. to purify magnesium containing silicon and iron impurities rather than to reduce magnesium materials such as dolomite, with ferrosilicon, at 1176° C. The loosely fitting plate 10 of the British ’060 patent construction serves during use as a shield to protect the retort cover by blocking the passage of metal vapors. The British ’060 apparatus could be used to reduce magnesium materials, such as dolomite, with ferrosilicon, at 1176° C.
42. The van Embden patent 2,252,052 (defendant’s exhibit 26H), based on application filed October 6, 1939, discloses sublimating apparatus for separating magnesium from ores. Magnesite ores with a suitable reducing agent are heated in a crucible to more than 1000° C. at a pressure of ten millimeters of mercury. The van Embden patent drawing is reproduced below. The charge 2 in retort 1 is heated by induction winding 8. The magnesium vapors condense on the inner surface of dome 12 which is cooled by radiation and the water jacket 7. The vacuum pump produces low pressure within the crucible and condenser dome, an aperture 13 being provided in the top of the dome to pass those gases which do not condense inside of the dome. The van Embden ’052 patent was not cited by the Patent Office examiner against either of the ’142 or ’143 patent applications.

*278

43. Amati patent 2,258,374 (defendant’s exhibit 261), based on an application filed January 26, 1940, discloses a process and apparatus for producing magnesium by direct thermal reduction. The Amati patent drawing is reproduced below. The Amati patent specification discloses that magnesium containing materials briquetted with reducers such as ferrosilicon may be heated under vacuum in reaction chamber 3, and the evolved magnesium vapors condensed in the removable condenser 5. The removability of condenser 5 is said to permit immediate re-utilization of the productive cycle. This patent was cited by the Patent Office examiner against both the ’142 and ’143 patent applications.
44. In the 1930’s Hérenguel, et al. published in France three related articles. The first and second were published *279 in Comptes Rendus in 1931 and 1932, and the third article was published in 1936. These articles, together with translations, are included in defendant’s exhibit 27 herein. They illustrate an instance of what was denominated the “cold finger” art during the trial. The articles were written as a disclosure of the work of the authors in preparing pure magnesium by sublimation, and relate generally to thermal purifying operations. The Hérenguel apparatus included an electrically heated furnace, a retort having its closed end extending into the furnace to serve as a heating or volatilizing zone, and a retort closure carrying a condensing device, consisting of a water-cooled tube, outside the furnace. For the purpose of maintaining a high vacuum within the apparatus, the outer end of the steel retort was water-cooled and fitted with a retort cover. According to the 1936 article, four spaced fractionating plates were carried by the tube attached to the retort closure. The periphery of these plates, or fins, is near but out of contact with the wall of the chamber surrounding the finned tube. Fig. 11 of the 1936 Hérenguel publication is reproduced below. This apparatus is described by the author, in part, as follows:
H« H« ❖ H* ❖
The lower portion receives the charge, distributed as a rule over the periphery.
The central portion, where the condensation of the metal is effected, is separated from the preceding portion by means of a filtering unit.
The upper portion has a series of plates fitted to the condenser tube. These receive the more volatile impurities (alkalines and iron chlorides) and, in forming screens (baffles) maintain the zone of condensation hot. A sheet metal sleeve bounds the surface of the condenser.
This entire assembly is shown diagrammatically in Fig. 11.
$ Hi Hi H* H*
45. The charges used by Hérenguel were impure commercial magnesium, or magnesium alloys, or magnesium scrap containing impurities such as metallic sodium, magnesium chloride, sodium chloride, and silicon. In the sublimation operation, the charge was first placed in the innermost or heating zone of the retort and the retort closure installed in

*280

*281

place, together with the condensing device carried by the closure. A screen type filter was provided between the volatilizing zone and the condensing zone to avoid the passage of solid particles of the charge to the condensing zone. The article indicates that during operation, the temperature in the retort volatilizing or heating zone reached 700°-800° C. Hérenguel observed that magnesium sublimated at 600° C. under a vacuum in the range from one micron to 100 microns. The main magnesium condensate collected with the fractionating plate condenser is described as being a substantially hemispherical block formed of large fibrous and very bright crystals. When the fractionating plates are used, a small deposit including magnesium and sodium is collected between the plates, and is described as being extremely porous and as burning spontaneously in air. The innermost of the Hérenguel fractionating plates serves as a fire wall between the main magnesium condensates on one side, and any pyrophoric magnesium or sodium deposited in the zone extending from that wall to the retort closure. The Hérenguel articles were not cited by the Patent Office examiner.
46. An article by Kaufmann, published in Germany in 1931 (defendant’s exhibit 27A), discloses results of research on the vaporization of magnesium under vacuum, and magnesium sublimation and condensing techniques. Kaufmann taught that sublimation of magnesium is possible at temperatures from 500° C. to 650° C. under a pressure of 50 microns, and that magnesium vapors could be condensed in the cold portion of an evacuated retort, in a removable tube *282 placed therein, in the form of well developed crystals coalesced into massive blocks. The article further taught that as temperature approaches the melting point (approximately 1100° C.), larger rock crystals of magnesium were formed. The condensing techniques taught by Kaufmann are applicable to magnesium vapors evolved from either thermal purification or thermal reduction operations. This article was not cited by the Patent Office examiner.
47. French patent 851,990 (defendant’s exhibit 27E), granted October 16, 1939, published January 19, 1940, discloses methods and apparatus for obtaining magnesium by thermal reduction under vacuum, and taught the use of reducing agents such as ferrosilicon. The reduction of magnesium containing materials at 1250°-1350° G. is disclosed. The French patent drawing reproduced below illustrates diagrammatically apparatus used with the ’990 process. The iron retort 1 is closed by cover 2. An auxiliary vessel 3 of sheet steel and having a cover 4 is inserted in the retort 1. The reaction mixture 5 in the form of compressed pieces is enclosed in the vessel 3. The reference numeral 6 designates the magnesium metal deposited during the reaction. The specification indicates that a wire netting may be arranged between the charge zone 3 and the cover 4 to retain any dust carried by magnesium vapors. The part of the retort 1 which projects from the furnace is equipped with a water jacket 7. The furnace is enclosed by a jacket 8 so that vacuum may be created in the furnace itself. Heating is accomplished by an electric device 9. Vacuum within the retort 1 and the vessel 3 is provided by a pipe 12 connected to a vacuum pump. The pipe 13 serves to create a vacuum, in the heating chamber. When the reduction cycle is terminated, vacuum in the retort is replaced by nitrogen gas introduced through pipe 14, and the retort cover 2 is removed. The vessel 3 and its cover 4 containing condensed magnesium are then removed from the retort and a new vessel with a fresh charge and a cover are inserted within the. retort 1 for the next reduction cycle. This French patent does not disclose the specific degree of vacuum pressure required for the reduction operation. The French ’990 patent was cited by the Patent Office examiner in the application which re-

*283

suited in the ’143 patent in suit. The French ’990 patent is similar to British patent 526,669, accepted September 23, 1940, and acknowledging a convention date of March 24, 1938, in Switzerland.
48. French patent 867,763 (defendant’s exhibit 27F), granted September 1, 1941, disclosed an electric furnace for the extraction and purification of magnesium at temperatures of 1300°-1600° C., in a vacuum. In the ’763 patent construction, the entire furnace interior is maintained under vacuum as distinguished from the use of a tightly closed retort. The ’763 construction provides a water-cooled cen *284 trally positioned tubular or plate condenser on which metal crystals are deposited. In the former, a sleeve, carrying spaced flanges, or fins, fits over the inner water-cooled tube and magnesium condenses on the flanged sleeve. In the plate condenser, the condensing tube has — in lieu of the sleeve — a plate at its end, upon which the magnesium crystals are to be condensed. The condenser is disclosed as provided with spaced flanges rearward of the surfaces on which the crystals deposit. The furnace is charged with reaction materials contained in an open iron basket. The nature of the reaction materials and the degree of vacuum required are not disclosed. The ’163 furnace may be reused after the insertion of a new charge of reaction materials and a new condenser structure. This French ’763 patent was not cited by the Patent Office examiner against either the ’142 or the ’143 application for patent.
49. The selected prior art discussed in findings 37-48 includes four items discussing the sublimation of magnesium, namely, Bakken ’348 in 1926, British ’060 in 1927, the Hérenguel articles in 1930'-1936, and the Kaufmann article in 1937. The art discussed also includes four items disclosing the thermal reduction of magnesium, namely, French ’990 in 1939, van Embden ’052 filed in 1939, Amati ’374 filed in 1940, and French ’763 in 1941. In addition to the above prior art concerned with the production of magnesium, there are somewhat analogous prior disclosures concerned with the production of zinc by thermal reduction. A “Belgian” retort for producing zinc is described in Metallurgy of Zinc and Cadmium by Hof man, published in 1922 (see defendant’s exhibit 26A). The gas-fired Belgian furnace contained a plurality of horizontally disposed tubular retorts having condenser portions projecting outside the furnace. Zinc collected in the condensers. The Belgian retorts could be recharged for cyclic operations. The Belgian retorts and condensers were made of clay and were not evacuated. The distilling of zinc is also shown in Frolich patent 629,008, granted in 1899 (defendant’s exhibit 26F). This early patent shows a condensing chamber having a series of annular partitioned discs or spaced baffles which may be removed from the condensing chamber when filled with condensed zinc, and may *285 be replaced by other spaced discs from which the zinc has been removed. Other prior patents disclosing the thermal production of zinc from its ores include British patent 2782 of 1901 (defendant’s exhibit 26B) and British patent 17,415 of 1901 (defendant’s exhibit 26C). These two British patents describe tubular retorts having evacuated condenser portions outside the furnace for condensing metal vapors.
50. Patent ’142 in suit states that it relates to metals and apparatus for the recovery of metals such as magnesium and calcium but that it may be utilized for the production of other metals such as cadmium and zinc. Patent ’143 in suit states that it is a continuation-in-part of the ’142 application.
51. As mentioned previously (finding 32), plaintiff conducted certain tests in an effort to reproduce and discredit certain prior art items. Plaintiff placed in evidence the results of tests it performed in an effort to show that the prior art represented by the Hérenguel articles and French ’763 patent was incapable of producing satisfactory results. These tests, under the conditions furnished by plaintiff, indicate that this element of the prior art, known as the “cold finger” 'art at the trial, was not as effective as the patented apparatus in the separate condensation of magnesium from other metals, and it may be inferred, not as attractive an operation from a commercial standpoint. But the evidence is not convincing that the cold finger apparatus and method were inoperative. To the contrary, it is clear that this portion of the prior 'art did teach a workable — if crude, when measured by later developments — method and apparatus based upon a cooled finned condenser which condensed magnesium upon its foremost surface, while vapors of more volatile metals were separately condensed beyond that point.
52. Method claim 27 of ’142 (finding 18) recites six steps comprising heating material, cooling the end of the retort, retarding the flow of vapors, further cooling, discharging the retort, and recharging the retort. Each of these steps is shown generally in the prior art. For instance, French patent ’990 (finding 47) discloses direct thermal reduction of magnesium compounds under reduced retort pressure by a method utilizing all of the above steps except possibly re *286 tarding tbe flow of vapors and further cooling. The apparatus and methods disclosed by the Hérenguel articles (findings 44,45), dealing with the sublimation of magnesium, and by French patent ’768 (finding 48), dealing both with extraction and purification of magnesium, generally utilize the same steps, and additionally, disclose the steps of retarding the flow of vapors and further cooling. The ’142 method claim recital of “a furnace under normal pressure and with the inside of the retort under subatmospheric pressure,” does not alter the method or the results obtained, as both the ’142 (as well as the related ’143) and the ’990 methods operate with reduced pressure in the reduction zone. The provision of evacuated retorts in normal pressure furnaces was well known as shown in the Amati ’374 reduction apparatus, and also in the Bakken ’348 sublimation apparatus. If the recited steps of retarding the flow of vapors, and further cooling, in method claim 27 of ’142 are construed, by reference to the disclosures of the specification, as well as the prior art, as limited to methods in which the magnesium (or other volatizable metal being sought) vapors are deflected by the foremost surface of the condensing apparatus — which remains free of condensate — to the cooler walls of the condenser where they condense to form a unitary structure, while allowing vapors of a higher vapor pressure to pass on and separately condense in a still cooler area, method claim 27 was not anticipated by the prior art.
53. Method claim 18 of ’143 (finding 19) recites five steps comprising heating material, retarding the flow of vapors, removing the magnesium, withdrawing the residues, and recharging the retort. Method claim 19 of ’143 (finding 20) is similar to claim 18, but specifically recites the steps of deflecting the flow of vapors at a point to cause the magnesium vapors to condense before passing the point, and of further cooling the uncondensed vapors adjacent the end of the retort. Both claims are generally similar to method claim 27 of ’142, discussed above, and each of the steps recited is shown generally by the prior art. For example, French patent ’990, which discloses the direct thermal reduction of magnesium oxide with ferrosilicon under reduced pressure, utilizes a method having all of the above steps ex *287 cept possibly retarding the flow of vapors, deflecting the flow of vapors, and further cooling the uncondensed vapors. The Herenguel articles (findings 44, 45) and French patent ’768 (finding 48) generally utilize the same steps, and additionally disclose the retarding of the flow of vapors and the further cooling of the uncondensed vapors adjacent the end of the retort. If these last two steps, and the step of deflecting the flow of vapors specifically recited in claim 19, are construed, by reference to the disclosures of the specification, as well as to the prior art, as limited to methods in which the magnesium vapors are deflected by the foremost surface of the condensing apparatus — which remains free of condensate— to the cooler walls of the condenser where they condense to form a unitary structure, while allowing vapors of a higher vapor pressure to pass on and separately condense in a still cooler area, method claims 18 and 19 were not anticipated by the prior art.
54. Apparatus claim 20 of ’143 (finding 17) recites a furnace, retorts, a condenser, reducing pressure means, a relatively warm zone and a cooler zone within the condenser, a vapor deflecting and retarding partition having a vapor passage therethrough separating the warm and cool zones of the condenser, a removable closure for each condenser, and the cooler zone of the retort being adjacent the said closure. Each of these elements is shown generally by the prior art. For example, French patents ’990 (finding 47) and ’763 (finding 48), dealing with the reduction of magnesium, and the Herenguel articles, dealing with the sublimation of magnesium, each disclose apparatus having all of the above recited elements except possibly the vapor deflecting and retarding partition having a vapor passage there-through separating the warm and cool zones of the condenser. In addition, the French ’990 patent and the Herenguel articles disclose a vapor retarding partition having a vapor passage therethrough separating the warm and cool zones of the condenser. If this element of apparatus claim 20 of ’143, specifically claimed as being a vapor deflecting and retarding partition, is construed by reference to the disclosures of the specifications and the prior art as limited to apparatus in which the foremost surface of the condensing apparatus re *288 mains free of condensate but serves to deflect magnesium vapors to the cooler walls of the condenser where they condense to form a unitary structure, while allowing vapors of a higher vapor pressure to pass on and separately condense in a still cooler area, apparatus claim 20 was not anticipated by the prior art.
55. Plaintiff is entitled to October 22, 1941, as the date of invention, this being the admitted date of plaintiff’s application for a Canadian letters patent. All of the patents and publications identified in findings 87-49 bear dates prior to October 22,1941. Plaintiff contends that it is entitled to an earlier date of invention, namely, August 1941, because of the operation of a pilot magnesium plant in Canada during said month. Plaintiff contends that its alleged successful reduction to practice in Canada during August 1941 antedates the disclosure date of French patent 867,763, referred to in finding 56. The French ’763 patent was applied for November 22, 1940, delivered September 1, 1941, and was published November 27, 1941. The effective date of said French patent as a reference patent is September 1, 1941. Defendant contends that Title 35 U.S.C. § 104 precludes plaintiff from establishing “a date of invention by reference to knowledge or use thereof, or other activity with respect thereto, in a foreign country.” Over defendant’s objection, evidence was received at the trial of this case concerning operation of a pilot magnesium plant in Canada during August 1941. The evidence indicates that tests and research done by plaintiff’s employees prior to September 1, 1941, were experimental, and that the experiments were continued after September 1, 1941. The evidence .is not sufficient to warrant a finding that the pilot operations in Canada during August 1941 included each and every feature of the ’142 and ’143 patent claims in suit, or that the experiments in August 1941 amount to a successful reduction to practice of the alleged inventions here in suit. Notwithstanding the provisions of Title 35, U.S.C. § 104, plaintiff has not proved that it is entitled to any date ahead of the effective date of French ’763 patent.
56. Method claims 27 of ’142,18 and 19 of ’143, and apparatus claim 20 of ’143, when construed as set forth in the fore *289 going findings (52-54) so as to avoid anticipation by the prior art, were not infringed by the operation of defendant’s magnesium producing plants located at Canaan, Connecticut; Wingdale, New York; and Manteca, California. In the accused operations, magnesium vapors condense directly on the block or backplate resting in the condenser sleeve, as well as on the sleeve itself. The block or backplate, or any condensate formed thereon, serves to halt the forward motion of the magnesium vapors. The magnesium vapors that do not immediately condense thereon are retarded and move toward the surrounding condenser sleeve where they condense to form, in conjunction with the magnesium condensate forming on the block or backplate, a dense unitary coherent mass on the hot side of the condenser partition. Any vapors of a higher vapor pressure than magnesium, such as sodium, will, if present, pass through the opening at the block or backplate and wind up in the space between this partition and the retort cover.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is therefore dismissed.

 In reprinting the claims in the succeeding findings, italics and paragraphing have been added.